## LEBARON v. PRINTING SPECIALTIES AND PAPER CONVERTERS UNION, LOCAL 388, AFL, et al.

### No. 7859.

District Court, S. D. California, Central Division.

Feb. 3, 1948.

Robert N. Denham, General Counsel. David P. Findling, Associate General Counsel, and Winthrop A. Johns, all of Washington, D.C., George H. O'Brien, of Los Angeles, Cal., and Dominick Manoli, of Washington, D. C., for National Labor Relations Board, Twenty-First Region.

Robert W. Gilbert, of Los Angeles, Cal., Clarence E. Todd, of San Francisco, Cal., and Allan L. Sapiro, of Los Angeles, Cal., for respondents.

McCORMICK, District Judge.

Sealright Pacific Ltd., manufacturers of paper milk bottle caps and closures and sanitary food containers (hereinafter called Sealright), under the authority of Section 10(b) of the National Labor Relations Act, as amended by § 101 of the Labor-Management Relations Act, 1947, 29 U.S.C.A. § 160(b) (hereinafter referred to as the Act), filed with the National Labor Relations Board (hereinafter called the Board) a charge that Printing Specialties and Paper Converters Union, Local 388, A.F.L. (hereinafter called the Union), had engaged in "unfair labor practices" within the meaning of Section 8(b), subsection 4(A) of the Act, 29 U.S.C.A. § 158(b) (4) (A), affecting commerce within the terms of Section 2(6) and (7) of the Act, 29 U.S.C.A. § 152 (6, 7).

The charge was duly referred to the Regional Director of the Board for investigation.

Howard F. LeBaron, the accredited and designated officer of the Board, has officially investigated such charge and as the result of his preliminary investigation he avers in a petition pending before the court his belief in the verity of the charge preferred by Sealright and he asseverates that a complaint based upon such charge should issue against the Union and its secretary-treasurer.

In line with the expressed Congressional purpose and policy of the amendment to the National Labor Relations Act as legislatively declared in Section 1(b) of the Act and conformable to the rewritten Findings stated in the Act, Title 29 U.S.C.A. § 151(b), and as required by the terms of Section 10(l) thereof, the accredited Regional Director, upon his supplementary factual ascertainment on behalf of the Board, petitions this court for appropriate injunctive relief against the Union and its above named officer pending final adjudication of the charge of Sealright against the Union.

In his verified petition the investigating Regional Director specifies as the basis and reason for his belief that injunctive process of this court is necessary as an aid and cooperative instrumentality to the Board during its consideration, and until its decision in the matter of Sealright's charge of unfair labor practices by the Union, the following factual situation concomitant to the dispute between Sealright and the Union:

"(a) Sealright Pacific Ltd. is a corporation organized under and existing by virtue of the laws of the State of California. Its principal office and place of business is located at 1577 Rio Vista Avenue, Los Angeles, California, where it is engaged in the manufacture, sale and distribution of paper food containers and milk bottle caps. In the course and conduct of its business, it purchases and causes to be transported to its Los Angeles plant from points outside the State of California, paper, steel, shipping cases, etc., all valued at an excess of $1,000,000.00 annually. Its finished products comprising milk bottle caps, milk bottle closures and food containers, are valued at an excess of $1,000,000.00 annually and more than 50 per cent of such products are shipped outside the State of California.

"(b) Los Angeles Seattle Motor Express, Inc., (hereinafter called L. A. Seattle), 1147 Staunton Avenue, Los Angeles, is a common carrier operating motor trucks between Los Angeles and points in the Pacific Northwest. It has carried Sealright's products for a number of years.

"(c) On November 13, 1947, respondent Walter J. Turner (vice-president) of Local 388, advised L. A. Seattle that if it continued to handle Sealright's products, L. A. Seattle would be picketed by Local 388.

"(d) On about November 14, 1947, representatives of Local 388 followed two trucks loaded with Sealright's products to the L. A. Seattle terminal where by forming a picket line around the two trucks containing the products of Sealright and telling the employees that the trucks contained 'hot cargo' and not to 'handle it,' induced and encouraged the employees of L. A. Seattle, by orders, force, threats, or promises of benefits, not to transport or handle the goods of Sealright. After November 14, 1947, as a result of the above conduct of Local 388 the employees of L. A. Seattle refused to transport or handle the goods of Sealright. Local 388 engaged in the foregoing conduct to force or require L. A. Seattle to cease handling or transporting the products of Sealright.

"(e) West Coast Terminals Co., (hereinafter called West Coast) is a public wharfinger with its docks and wharves located on Pier A, Berths 2 and 3, Terminal Island, Long Beach (2), California. On or prior to November 17, 1947, West Coast received from Panama Pacific Lines Vessel S.S. Green Bay Victory, a consignment of rolls of paper destined for Sealright's Los Angeles plant.

"(f) On November 17, 1947, while employees of West Coast were engaged in loading the rolls of paper onto freight cars consigned to Sealright in Los Angeles, a group of pickets representing Local 388 appeared at the docks of West Coast and, by forming a picket line around the freight cars being loaded with the rolls of paper for Sealright, induced and encouraged the employees of West Coast, by orders, force, threats, or promises of benefits, not to handle or work on the paper consigned to Sealright. Since November 17, 1947, as a result of the above conduct of Local 388 and the continued picketing by Local 388 of the docks of West Coast, the employees of West Coast have refused to handle or work on the goods consigned to Sealright. Local 388 engaged in the foregoing conduct in order to force or require West Coast to cease handling or transporting the products of Sealright."

Upon motion of George H. O'Brien, Esq., one of the accredited attorneys of the Board, an order to show cause has been issued directed to the Union and to Mr. Walter J. Turner, an officer thereof, requiring the showing of cause herein by them why pending final adjudication by the Board with respect to the matter of the accused unfair labor practices they should not be enjoined and restrained from continuing such activities.

Both respondents duly appeared on the return day of the order to show cause and through their attorneys, Messrs. Gilbert, Todd and Sapiro, they interposed a motion to dismiss the Board's petition for injunction upon jurisdictional grounds that the invoked sections 8(b), (4), (A) and 10(*l*) are violative of Amendments I, V and XIII of the Constitution of the United States.

In support of the motion the respondents filed simultaneously therewith an affidavit of Mr. Turner, recounting various steps that have occurred in a labor dispute relating to wage rates and holiday pay between the Union as the collective bargaining agency of the production employees of the Los Angeles plant of Sealright and such corporation which he avers culminated in a strike of 67 of the approximately 70 production workers in such local plant of Sealright on November 3, 1947.

The only variance between the factual situation ascertained by the Regional Director of the Board and specified in his verified petition and that attested in the affidavit of Mr. Turner is his statement that the picketing at each of the described locales was "peaceful."

█ While, in conformity to the rule enunciated by the Supreme Court in Hecht Co. v. Bowles, Adm'r, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754, we have given appropriate consideration to all of the evidential material before the court, we have concluded that under the unequivocal procedural mandates incorporated in the Act, a finding should be made, and is accordingly made, in this proceeding of the existence of "reasonable cause" for the Regional Director's belief that an "unfair labor prac-

tice" as defined in Section 8(b), (4), (A), has occurred.

■ Therefore it seems clear that the specific injunctive processes expressly conferred upon this court by Section 10(*l*) of the Act become operable upon the credible petition of the administrative agency as provided in the Act, unless some constitutional limitation supervenes to forestall the restrictive restraint which the Act provides for the situation before us in this matter. Switchmen's Union v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61; Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 510, 63 S.Ct. 339, 87 L.Ed. 424; United States v. San Francisco, 310 U.S. 16, at pages 30, 31, 60 S.Ct. 749, 84 L.Ed. 1050; Securities & Exchange Comm. v. Torr et al., 2 Cir., 87 F.2d 446; Otis & Co. v. Securities & Exchange Comm., 6 Cir., 106 F.2d 579, at page 583; Walling, Adm'r, v. T. Buettner & Co., 7 Cir., 133 F.2d 306; Henderson, Adm'r, etc. v. Burd et al., 2 Cir., 133 F.2d 515, 517, 146 A.L.R. 714; Bowles v. Swift & Co., D.C., 56 F.Supp. 679; Porter, Adm'r, v. Elliott, D.C., 5 F.R. D. 223, at page 225; Douds, Regional Director, N.L.R.B., v. Local 294 International Brotherhood of Teamsters, etc., A.F.L., D.C.N.D.N.Y., 75 F.Supp. 414.

Before turning to the very delicate constitutional issue that is involved under the established concrete factual situation before the court, attention should be given to the significant and broad change in legislative policy that is definitely declared and clearly expressed by Congress relative to the use of injunctive processes available in the District Court to ameliorate the public interests in the federal area of labor disputes. Not only is it stated in Subsection (h) of Section 10 of the Act that the equitable jurisdiction of federal courts is no longer to be circumscribed by limitations specified in the Act approved March 23, 1932, 29 U.S.C.A. § 101 et seq. (Norris-LaGuardia Act), but Subsection (*l*) of Section 10 further amplifies the National polity of utilizing appropriate judicial injunctive methods in the specific activities that are made unlawful in Section 8(b), (4), (A), of the Act "notwithstanding any other provision of law."

It is evident that unless the decisions of the United States Supreme Court indisputably show the unconstitutionality of Section 8(b), (4), (A) of the Act as incorporated in the new restraint processes now applicable in labor disputes pursuant to the limitations in Section 10(*l*) of Labor Management Relations Act, 1947, this court should grant an appropriate injunction auxiliary to the proceedings in the Board and until the labor dispute pending before the Board is finally adjudicated by the Board.

The substantive provisions of the Act that are here challenged as constitutionally assailable read thus: "It shall be an unfair labor practice for a labor organization or its agents—

"to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person."

■ We find no support whatever, under the record before us or within the provisions of the Act that are involved in this matter, for a finding or conclusion that the Thirteenth Amendment has been transgressed.

We are not here considering a criminal statute or parts of an act which relate to outlawed activities characterized as crimes.

The measure involved pertains solely to activities classified in the law as torts, or in other words, wrongs of a civil nature, and the inherent and statutory rights of employees, as such are preserved by saving provisions in the Act, which read thus: "Nothing in this Act shall be construed to require an individual employee to render labor or service without his consent, nor shall anything in this Act be construed to

make the quitting of his labor by an individual employee an illegal act; nor shall any court issue any process to compel the performance by an individual employee of such labor or service, without his consent; nor shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees be deemed a strike under this Act." 29 U.S.C.A. § 143.

The provisions of the Act under scrutiny are products of legislation that clearly under the Constitution are within the power of Congress to enact. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 46, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. They are regulatory statutes directed at the control of acts and practices of labor organizations and their agents in the field of interstate commerce that to Congress seemed contrary to the public interest and inimical to general welfare.

■ The words employed by the legislative body to reach the evil contemplated are clear and precise. It is only coercive and compulsive conduct that is proscribed, and even measured by the stricter rule which applies to criminal statutes Section 8(b), (4), (A), is not unconstitutionally vague or indefinite. See United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538.

■ But it is contended that the provisions of the Act upon which the Regional Director, on behalf of the Board, seeks injunctive relief from this court infringe the freedom of speech and assembly guaranteed to all by the due process clause of the Fifth Amendment and by the First Amendment to the Constitution. We think such contention untenable in the situation before us.

■ It will of course be admitted that the statute, doubtless designed by Congress to effect a practical and beneficent purpose in the federal regulation of industrial controversies, should be upheld if it can be construed in harmony with the fundamental law, and as stated by the Supreme Court in Brown v. Walker, 161 U.S. 591, at page 596, 16 S.Ct. 644, 646, 40 L.Ed. 819: "Instead of seeking for excuses for holding acts of the legislative power to be void by reason of their conflict with the constitution, or with certain supposed fundamental principles of civil liberty, the effort should be to reconcile them if possible, and not to hold the law invalid unless, as was observed by Mr. Chief Justice Marshall, in Fletcher v. Peck, 6 Cranch 87, 128 [3 L.Ed. 162], 'the opposition between the constitution and the law be such that the judge feels a clear and strong conviction of their incompatibility with each other.'"

We think it indisputable that if the factual situation disclosed by the Regional Director is considered realistically it will be manifest that an object of the picket line at "L. A. Seattle Terminal" and at the harbor in Long Beach, California, was coercion, and the type of coercion that is attended with serious repercussions and dire consequences upon the interests of the two strangers to the labor dispute between Sealright and the Union. Cf. Bakery and Pastry Drivers and Helpers Local v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178.

The picketing activities, which prompted the representatives of the Board to petition the court for injunctive relief, can in truth hardly be said to have been motivated by "dissemination of information concerning the facts of a labor dispute." A candid and forthright appraisal of the picketing activities in question classifies them as a form of forcible technique that has been held to be subject to restrictive regulation by the State in the public interest on any reasonable basis. Carpenters and Joiners Union v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143. And in the exclusive federal field of protecting the interests of the public in interstate commerce against forcible obstruction to the free flow of such commerce, Congress has, we think, in Section 8(b), (4), (A), kept within the permissive restrictions on free speech and assembly that have been approved by the Supreme Court in comparable legislation. See Thornhill v. State of Alabama, 310 U.S. 88 at page 105, 60 S.Ct. 736, 84 L.Ed. 1093.

■ The observation of Mr. Justice Douglas in the concurring opinion in Bakery and Pastry Drivers and Helpers Local v. Wohl, supra, delineates the evils of "the secondary boycott" which has met disap-

proval by the Supreme Court in Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 179, 65 L.Ed. 349, 16 A.L.R. 196. The learned Justice in the cited recent labor case aptly stated [315 U.S. 769, 62 S.Ct. 819]: "Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. Hence those aspects of picketing make it the subject of restrictive regulation."

We find that the provisions of the Labor Management Relations Act, 1947, here under attack are valid Congressional legislation and are not unconstitutional.

The respondents' motion to dismiss the petition for temporary injunction is denied in toto.

Accordingly, the attorneys for the Board will within two days from notice hereof serve and present a proposed temporary injunction against respondents in the terms of Section 8(b), (4), (A) of the Act and pursuant to Section 10(l) of the Act, without costs.